We'll hear argument this morning in Case 14-723, Montanile v. Board of Trustees of the National Elevator Industry Health Benefit Plan. Mr. Stris. Thank you, Mr. Chief Justice, and may it please the Court. In this ERISA case, a fiduciary has sued a beneficiary to establish and enforce an equitable lien by agreement. As this Court has repeatedly acknowledged, an equitable lien is enforceable only against specific property and its traceable product in the defendant's possession. Mr. Stris, there's some fuzziness about the facts in this case, and maybe at the outset you can clarify them. Different figures are given about how much money from this settlement was actually delivered to your client, and also, what did your client do with it? Did he put it with his general assets or did he keep it in a separate fund? Maybe you can start by answering those questions. Stris I think I can, Justice Ginsburg. So I want to start with what's in the record, and then I want to add some color that I think will provide context. So as far as what's in the record, there was a genuine issue of material fact on how much dissipation there was. One thing that's clear from the record is that — Before we get to dissipation, how much did he receive? Yes. So that's clear. He received over time, after all expenses were out, about $200,000. $200,000. I think that's clear from the record. What's also clear procedurally, and this is important, and this is page 64 of the Joint Appendix, is that he took the position in opposing summary judgment that he has very little of the money remaining, and he cited a declaration and an attached sheet that I admit are confusing. And this $200,000, did he put it in a general account or was it set aside in a specific account? There's nothing in the record to indicate that, but I think as far as the rules work, it wouldn't matter, because the rules for equitable lien by agreement, the tracing rules, are actually very robust, Justice Kagan. And so as equity evolved, you cannot dissipate money by putting it in its own account and spending it. Something called the lowest intermediate balance rule developed to prevent against precisely the kind of mischief that we would reasonably worry about. But, Mr. Stris, it does make a difference, because if he just put it, say, in the bank account where he had all of his other money, then how could we say that he spent all of the proceeds on child care and living expenses? If you have one mixed pot, how can we say, oh, yes, this came from the settlement and not from his general funds? It's a very fair question, Justice Ginsburg. And there are settled tracing rules at equity, and it worked as follows. If you took money and it was cash and you put it in a bank account, what was presumed was that unless your total cash assets dipped below the amount that you got, that the spending that you did was not out of that, the creditor's rights were not impaired. So the only way we would prevail on remand, I want to be clear about the modesty of the position that we're taking here, the only way we would prevail on remand is if he got the money and he spent it down, all of his money, not just the settlement, but all of the cash that he had down below the amount of the settlement. That's why this is very important. Roberts. Well, I don't know if it's the right Latin phrase or pro tanto or something. I mean, you would lose — it doesn't have to spend it all the way down. Whatever is left would be subject to tracing. Yes. Mr. Chief Justice, that's correct. But the point I was trying to make is there's a big difference between the way equity worked, which was to have a sensible rule, the lowest intermediate balance, and what I view as the extreme swollen asset theory that never was applied at equity that my friend Mr. Cotfield is advocating. Under the swollen asset theory, if you get new money in the future, if you spend below the lowest intermediate balance, but then you start earning income, people can come and garnish your wages. So the point that I'm making here is that the equitable lien by agreement remedy is actually far more robust than one would think if one read the briefs of the other sectors. Equitable lien by agreement. Was there an agreement? Do you think there's an agreement here because of the plan? I think that issue we've lost. So, I mean, you know, I think that's another important point, Justice Kennedy. We hear a lot about promise breaking by beneficiaries. And that happens. And those are legitimate concerns. But from where I'm sitting, I see a lot of cases where there's promise breaking by fiduciaries, where they take a reimbursement provision that's preempted in an insured plan and they try and enforce it, or where they try and enforce a provision that doesn't apply by its own terms. So when we're thinking from the perspective of is this a sensible rule that is consistent with the broad purposes of ERISA, I think it very much is because if you take the ability of fiduciaries to reach the general assets of participants or just as a background matter, when we left, as I understand, Great West, we left the issue open. If the beneficiary receives a check that by mistake is three times more than it should be, but he may think it's a bonus, he may not understand it, he spends it all, is there a legal action that the plan can take to recover that money? If I could not answer a yes or no for a minute, and I promise I'll come back to a yes or no, I think it's a very important question, because this happens all the time in the pension context. So the first thing I'm going to tell you is that usually when that's the case, there is an error on the part of the plan. And our view is even if there were no remedy, that it's not consistent with the to make the participant the insurer of that type of error. Now, there are remedies. And here's what they are under arrest. The first one is a set-off remedy. And in Section 2C of the Great West opinion, this Court made that very clear. For future payments. Against future payments. And that's used repeatedly in pension and disability cases. Suppose that weren't available. Okay. So if that's not available, if you have a case where there's outright fraud, and I don't think that's your fact pattern, but if you have a case where there's outright fraud, and I've seen these, where a participant receives money because they claim that someone is still alive, but they're actually dead. I think that there's a remedy there, because in terms of outright fraud. In law. Well, the second prong of Davila wouldn't be satisfied. So ERISA does not, ERISA's broad preemptive sweep does not go so far as to stop plans from policing outright fraud. Now, the more difficult issue is your question. Right. Which is, what if there's not outright fraud? What is the obligation of the beneficiary who gets that check and knows it's three times, you know, what I got? Like, this can't be right. You know, if the beneficiary is a bad actor and says, you know, I'm going to get one over on the plan, and I'm going to keep this money, and I'm going to spend it, in the rare case where that person was of limited means, and they spent the money down, and it was dissipated, I think, unfortunately, I would have to say that I think a plan would not have a remedy. But the reality is that's a very rare case. And because State law legal remedies are preempted by ERISA? Yeah. That's essentially the regime. Is that a position that's generally accepted, or is this an arguable point? From the perspective of this Court's cases or? Yes. I mean, I think the letter of your cases. I thought Great Western had left that open.  So I think that's fair. The letter of your cases does not bind us here. I'm not making a pure statutory stare decisis argument. But if cases. I'm just asking, is there a rule in the courts of appeals or in the legal system generally, or are they divided on this, or just nothing written on it? Well, in the context of ERISA, how you would rule in this case would determine that issue. And so the circuits are split. That's why I think the issue is very important. This is not just a subrogation matter. This is an issue that will have dramatic impact in the pension and the disability context as well. Counsel, if you prevail here and are representing a fund, what would you advise them to do so they don't confront this result in the future? Yeah. It's a good question. And I do advise funds. And I think that there's a simple answer, which is funds that are responsible and sophisticated will do exactly what they've always done. And this is a very important point. Funds are always worried about dissipation. Health insurers have always been worried, and here's why. The mine run of individuals who get a large tort settlement, this is just a reality of life, they're effectively judgment-proof except for that tort settlement. So the remedy doesn't matter. In other words, even if you had a compensatory damages remedy in most cases, once that money is spent, you've got nothing. So what health insurers and plans have done since well before Great West, and they've continued to do it after Great West, is when a medical claim is submitted, they investigate it carefully, and they look and flag the ones where there's likely a tort — there could be a tort recovery. They monitor them carefully, either internally or through outside subrogation agents, and they act promptly. And, you know, I'm not going to say it's not a dance, because we see a lot of litigation in this area, because there's a lot of money passing through. But plans have faced this problem since before Great West. These policy arguments about how this is a concern about dissipation were made in Great West, and I just think they're substantially overblown. Roberts. When you say they act promptly, what do they act promptly to do? And is it always the case that they can act promptly enough? No. You know, whatever rule you pick, there will be cases where we don't like the result on both sides. I can give you examples on the other side as well. Well, presumably in the hypothetical, your opposing counsel will be advising the recipient to, I suppose, spend it right away, because then there won't be anything left. It will have been dissipated, or put it in different accounts, or commingle it with, you know, a variety of things. And I'm just wondering if the solution you're advocating is going to make life a lot more complicated and expensive for the funds, which is, of course, contrary to the idea of preserving the asset. I understand that point. I think the answer is no, not in any meaningful way, and here's why. You ask what you do. Well, you write letters and you put people on notice of your lien, and a lot of people are affected by that. Lawyers. How do you put people on notice? That's a legal concept. A letter is one thing. But what is necessary? What is the action necessary? Is it going into court and say, enjoin this person from spending any of that money? Here's what plans do and here's what plans should do. They write a letter. The minute they find out there's a settlement, they contact, they ask to be paid. If they're not paid immediately, they say put this money in escrow because we have a dispute. If the person says no, you have a pretty good idea that you might have a problem and you go into court. And this is a perfect example with regard to Mr. Montaniel. There were six months of negotiation, several letters where it was said, hey, if you don't, if we don't decide by this date, we're going to distribute the money. How do you find, how does the plan find out that there's been a settlement? Well, they find out in many ways. So a lot of cases actually result, include where there's large dollar amounts and a lawsuit is actually filed. But in cases when no lawsuit is filed, there's traditional. I'm sorry, the lawsuit between who and whom? A State court lawsuit is filed. You mean by the beneficiary to recover the tort claim? Yes. And how is the plan notified of that? Well, because of the risks that we're talking about right here in this dialogue, plans are very sensitive to making sure that the minute that there's a potential subrogation recovery, they write letters to everyone, to the participant, to the participant's lawyer, the insurer, and they say, we have a lien, and please notify us if anything happens. Do they have a lien? In some cases they do, some cases they don't. But they say they do anyway. Well, I've seen both. Look, I don't actually think it's a pretty controversial point. There are some people, no matter where they're sitting, that misbehave. And so I have seen participants who break promises, absolutely. I also have seen plans that are trying to enforce provisions that are not enforceable. Would basically ignoring the impact of that letter by a beneficiary be a basis for the sort of fraud action you were talking about earlier? No, I don't think so. So the beneficiary, even the beneficiary's counsel, gets a letter saying, by the way, we have a lien on this, you know, good luck, I hope you recover a fair amount. But if you do, make sure you put it in a separate account, make sure you notify us, and if the beneficiary or the lawyer just ignores that, that's not a basis for fraud? It would depend on the facts of the case. That, you know, merely ignoring the letter, I'm not so sure. But I guess I keep coming back to the same point. This is a legitimate problem. I don't mean to demean that at all. But this has always been a problem. And because of the fact that most people who have these monies are of limited means, the compensatory damages remedy is of very little help. And so plans came to this Court in Great West and said, oh, well, this is going to be a disaster if there's a present possession requirement, and yet it hasn't proven to be the case, because people in their circumstances act promptly, and in most instances they're able to protect their rights. Mr. Strist. This may be where the law leads us, but in your brief, you try to make the argument that this is equitable in the ordinary sense of the word, and I don't understand that. What sense does all of this make? Okay. So that's a fair point, but I would put it a little bit differently. What I would say is that I think a fair-minded policymaker could certainly pick the rule that we're describing. I'm not going to get up here and tell you that it's the rule that I would pick, but I think a fair-minded policymaker could. And particularly, Justice Alito, when you appreciate that it's a rule that's going to apply to all cases, not just subrogation, I think the case for this as a policy matter becomes much stronger in the pension context. The reason I make that point is I know that I'm running up against this counterintuitive view that how can our position, even if it's what the cases say, even if the unbroken line of history means this, how can it not be totally at odds with the core purpose of ERISA? And I think it's not. It may not be the better policy in your view, but it's certainly one that is consistent with the spirit of ERISA. And so the decision that needs to be made is what is this line of cases that this Court has decided, what do they say? And I think repeatedly from Great West to Sereboff, you reiterated in Cigna that in nonfiduciary cases a lien is not equitable relief unless it's against property in the defendant's possession. You have adopted a historical test. And so unless applying it here is so obviously at odds with the purposes of ERISA, I think that applying that test, the unbroken line of authorities tell us that the rule is you can only enforce these liens against specific property or its traceable product. If I could reserve. Thank you, counsel. Ms. Anders. Mr. Chief Justice, and may it please the Court, if I could just start with Justice Alito's question about what sense this framework makes. I think in limiting available relief to equitable relief in ERISA, Congress I think contemplated that there wouldn't be a remedy for planned breaches in every case. And so the framework this Court developed was to distinguish between equitable relief on the one hand and things like damages that clearly Congress didn't mean to include in the relief that would be available. And so I think it's been true since Great West when this Court interpreted equitable relief pretty narrowly, that a beneficiary will have an incentive in some cases to structure a settlement in order to avoid paying reimbursement to the plan. But it's also been true since Great West that because of that, plans have a need to counter those incentives by diligently protecting their rights. And so I think the way that the Court rules in this case is not going to affect the existence of those incentives on the part of beneficiaries or the need for plans to be diligent. So I think it's important to keep in mind here that the only reason this issue comes up in this case is that the plan wasn't diligent, that the plan waited for months when it knew that it had a reimbursement claim and that that was being disputed. It didn't seek an injunction. It didn't file suit. So, you know, I think this is a situation that is unlike the mine runoff cases, where we see that plans since Great West have developed measures that they can take in order to protect their rights. Ginsburg. Ginsburg. In Great West, the government filed on the side of the plan. What led the government to shift its position? I think in Great West, I think we were taking a somewhat broader view of equitable relief than the Court ended up adopting in that case. And so as we get here today, we've taken this position because we think it is absolutely the logical consequence of Great West and Sereboff put together. So you took your position because of Great West? That's absolutely right. I think in Great West, the Court said that when the funds are not in the beneficiary's possession, the plan cannot enforce an equitable lean or cannot get equitable relief against the plan. And it said it relied on equitable authorities. It said, quoting, If the property or its proceeds have been dissipated so that no product remains, the plaintiff may not enforce a constructed trust or equitable relief. Roberts. I'm sorry. But you thought Great West adopted a narrower understanding of what equitable meant in this context than you thought was appropriate? I think at the time we were arguing for a broader understanding. But as we come here today, of course, nobody has argued that Great West or Sereboff should be overturned, or Mertens for that matter. And so we think the consequence of those two decisions is that there will not be relief in a case in which the plan participant has dissipated the funds. Ginsburg. But will you say what is the government's position on Coe-Mingling? The beneficiary gets the check, puts it in his bank account, together with whatever else he has in there. So how do we tell if he's dissipated? I agree with my friend that the Coe-Mingling rule at Equity, I think, reflected the fact that once funds have been dissipated, the lien holder can no longer collect. So the way it worked was that if you had funds in your account and you spent them, that at first it would be presumed that you were spending your own money, but once you got down below the amount that was originally subject to the lien, the lien holder would only be able to enforce against whatever remained in that account, even if it wasn't sufficient to satisfy the lien amount. So it's basically the same dissipation rule that applies in cases that don't involve Coe-Mingling. Why can't, in a case where there's no time problem, forget the delays and so forth, but like this one, the plan sue the lawyer? I mean, if it was $500,000 and the lawyer received $200,000, he certainly received it with notice. He's not any kind of good faith purchaser. Why can't they get it back from him? I think there may be situations in which the plan could sue the lawyer. Why couldn't they normally, in my situation? I think they probably could in that situation. Right. If they could, then doesn't that solve the problem for them, because lawyers will have to be awfully careful not to dissipate the funds if, in fact, they're going to be subject to the lawsuit? Well, I think that's right, and I think lawyers also have ethical rules that prevent them from dissipating funds. Well, wait a minute. I mean, if they can get it from the lawyer immediately, why can't they get it from the lawyer at the end of the day? I mean, do you mean that the fund can get back not only what the beneficiary receives, but also what he has paid his lawyer? No. I just mean that if the funds are in the lawyer's possession, the lawyer is the agent of the beneficiary, I think in that situation, equity would permit the plaintiff, the lien holder, to trace that lien amount. To get the whole amount from the lawyer, right? Leaving the lawyer without his fee. Yes, I think that could be correct. I mean, and plan for it. I thought in most States, the lawyer has a lien on the fee. His lien is prior. I may be wrong. His lien, the lawyer's lien, is prior to the fee. That has to be, or nobody would take these cases. That may be correct. I don't think this situation has come up very much, but I can't say why. I don't see why it would be. There is a fund. The fund belongs to Person X. The lawyer knows it belongs to Person X. Nonetheless, the lawyer takes $200,000 out of the money that belongs to Person X and gives $300,000 to the client. I assume the client is more likely to spend money down than the lawyer, because lawyers tend in general to have a larger bank account than poor clients. So therefore, I do not see why they wouldn't sue the lawyer, but they aren't. So there is something I didn't understand, hence I am asking the question. I don't think it's come up very much, but I do think it's possible that in some situations, plans may be able to sue the lawyers. They can sue other. It must depend on how the agreement reads. I can't imagine the agreement wouldn't require the beneficiary to turn over the net, not the gross, but the net recovery, what he receives after paying legal fees. Well, I think a lot of these plans are going to disclaim a common fund or, you know, they're going to disclaim their obligation to have the attorney's fees counted against them. So the person's rights is going to be the entire amount. But just to make a broader argument. But there's a model. There is two diamond rings belonging to a trustee. They end up being given to the cousin. The lawyer has them in his safe. I do not believe that no matter what the agreement between the cousin and the lawyer, the lawyer can take the diamond ring that belongs to somebody else and he knows it and put it in his pocket, no matter what the agreement. Right. He's not a bona fide purchaser for value in that situation. But I think the plans do have many other remedies in these situations. They can trace against any third party who takes the property with notice of a lien. They can monitor the litigation. They can intervene in these suits. They can seek injunctions. These are all things that the plan here did not do. And just to pick up on a point that my friend was making, I do think that this is a situation in which reasonable policy makers could differ. There are legitimate concerns on both sides. It is absolutely a legitimate concern that in some cases a plan may not be able to recover, even if it has diligently protected the rights. But all of those things you say the plan can do, though, are a lot more complicated than simply saying they should be able to recover that to which they're entitled under the agreement. And when you get into, we've noted before that we try to avoid complicating the procedures in this area for the simple reason that nobody has to set up one of these plans. And if they don't know how much it's going to cost in advance and all, they'll just say, well, it's not worth it. And if I've got to go and file injunctions or this or that every time somebody has a tort recovery, I'm not going to do it. I won't set up one of these plans. Well, I think an important point, Your Honor, is that no matter how the court rules here, the plans are going to have those obligations and they're going to have those burdens because Great West permits beneficiaries to structure their settlements to avoid paying reimbursement to the plan. So because of that, ever since Great West, plans have taken these measures and they will continue to take them, even if the court rules for responding. What are the concerns on the other side, which you have mentioned and which your friend also mentioned? What are they? So one concern, as he said, is that whatever rule the court announces is going to apply in the pension and disability benefit context, too. And in that situation, the plan may be making overpayments to beneficiaries over a long period of time, and the beneficiary may spend the money without knowing that she's going to be responsible for reimbursing it later, or that it's not her money to spend, in a sense. And so in that situation, I think a policy maker could be concerned about a plan being able to go back months or years and be a beneficiary, so I think this is really a question for Congress. But what Congress could do is it could weigh that potential against the downsides to the plans, the fact that since Great West, they have had these obligations, they have needed to diligently protect their rights. And I think in the minority of cases, they've been able to do so. So I think those are the things that Congress could weigh in looking at the policy concerns on either side of this. And that's why we think those concerns really shouldn't drive the analysis here. This- Can I shift gears a little bit and just ask, the test that we've set up is whether a remedy is typically available at equity. And there's been some back and forth, I think, about what that means. What does it mean? I think typically available in equity meant remedies that were considered to be equitable in nature. So it certainly did not include, as this court said in Merton, the type of clean up relief, such as deficiency judgments or lean destruction damages that that court's thought of as legal to the end of the time at the divided bench. Thank you, counsel. Mr. Cockeill. Thank you, Mr. Chief Justice, and may it please the court. Three things are undisputed. First, that Montanil signed a form saying, quote, I agree to reimburse in full the plan from any settlement. Second, the plan provides that such funds are, quote, assets of the plan, not distributable to any person without the plan's written release. And third, under Sereboff, that the plan would have an enforceable claim under 502A3 if Montanil still possessed the funds. What we're disagreeing about is whether Montanil's decision to commit a second wrong of spending the plan's money himself has made him judgment proof. And the answer is no for a very simple reason. When a right under equity has attached, and a defendant then knowingly frustrates that equitable claim, it is absolutely part of equity to permit that claim. This reflects the cold reality that the defendant took actions that blocked an otherwise valid claim in equity. I have no idea where you think this lien attached. Do you think it attached at the fund, the whole 500,000? Or the amount of that 500,000 that ended up in his pocket? Or that 500,000 minus what, if anything? So it's, Barnes says that the lien attaches at the moment that he's got entitled to the thing. He gets titled to the thing when there's a $500,000 settlement. Settlement, of course, that we didn't know about, but that he nonetheless did. So your position is at that moment, it goes to the lawyer, it's his money, all 500,000. You're entitled to whatever. To a lien of $121,000 on it. And so our claim is not that we have some general remedy at law that we can get compensatory, consequential damages, or punitive damages. It's limited by the lien itself. And that is the rule in equity, that when someone frustrates a valid claim in equity by taking actions to dissipate the fund, you can get recovered the value of that fund. You can't recover more than that. So this is the bidder with the suite, that when you make an equitable claim like this, you have to be limited by all the rules of equity. So in addition to that, Justice Sotomayor, we couldn't, for example, try and attach the asset, try and attach and file a lawsuit until he actually took possession of the fund. Breyer. I found a list, on this list, I have, one, there is the fund, 500,000 in it, it belongs to the company, not to him. Now, he takes the fund and he begins to distribute it with the aid of his lawyer. Some of the money goes to the lawyer. If that money is still there, I imagine you could get it. Some of the lawyer goes to his bank account. If, in fact, that bank account has not gone from the time he put it there to the time you sue, below 121,000, you can get it. Indeed, if it has gone below, you can still get it if there is even a penny. But you can only get the penny. If he has taken the 121,000 out of it and given it to a person with knowledge, for example, his wife or children, and it is in their bank account, I guess you could get it. And indeed, if they have gotten and bought with it some tangible item that you can trace it to, I guess you can get it. But what we could not find, and in fact, if you can't find any of those, you could still sue them under State law, under State fraud statutes, and recover in damages. That's at law. And maybe you can do it even under such a remedy where it's much more mixed up than the other side was prepared to give you credit for, in which case you have State law remedies at law. Now, what I could not find is a case embodying the theory you are now advancing, that he simply gets the damages even where he doesn't have any of the remedies that I just mentioned. So first of all, we are not advancing that theory, Justice Breyer. You cannot get — we are not advancing a damages theory whatsoever. All we are saying is that you can recover the value of the lien itself when someone frustrates an equitable claim that otherwise exists, and we point to three different traditions in equity that permit you to do that. Substitutionary monetary decrees, deficiency judgments, and swollen assets. All of those reflect the basic idea that someone shouldn't profit from their second wrong, their wrongdoing of dissipating a fund. So, look, there is a — they are absolutely right. The general rule is that you can't recover from general assets. That is absolutely right. But there is an urban legend that's — that I think the briefs try and spin around that rule to say that that general rule encompasses a situation when someone acts wrongfully to dissipate a fund as to which someone has a claim. In that circumstance, as Justice Holmes' opinion and Otis says, he says, if the complaint, quote, "'seeks the recovery of an identified fund,' that complaint will not fail because the fund is gone and misappropriated by the defendants. Rather, under those circumstances, the plaintiff has a right to compensation as alternative relief.'" That's not damages. Scalia, I think it's not for several reasons. Number one is, of course, in that case, the entire fund was gone. So if it were cleanup jurisdiction, there had to be something to pend to. There had to be some ancillary jurisdiction, some equitable claim. There had to be some fund that was still remaining in order for there to be something to pend to.   The entire fund was gone. The entire fund was gone. Is that the requirement? Well, I think that otherwise there wouldn't be. There has to be some of the fund there? Otherwise, Your Honor, there wouldn't have been any reason. There is a requirement that in order for. There would have been equitable jurisdiction so long as the person had possession of the fund at one point. I don't think that there's. And then when the suit is completed, it's discovered that all of the fund is gone. No, Your Honor. If their argument is right, and this is something Judge Posner has said, for example, in describing this in the Medtronic case, in order for ancillary jurisdiction to exist, there has to first be a valid equitable claim, and then, for the convenience of the parties, you can resolve a legal claim. In Otis, there was no equitable claim under their theory, which is, you know, if the fund is gone, there's no lien that it's attached, it's gone, it's dissipated. So and then I'd also say, you know, it's remarkable that they say that all of these cases are clean-up investigations. If there's no equitable cause of action for them, why is there for you? Because we think that the proposition that they're trying to say is wrong, the idea that when you dissipate a fund, you lose your equitable claim. Our point is that is that's generally true, not true in a circumstance when a defendant frustrates an otherwise valid equitable claim. So you ought to be able to bring suit in equity without asserting that the person ever had the fund in his hands. Well, you can't do that. You say he owes me the money. You can't do that, of course, as Knudson says. And that's a standard rule. We're not here to complain about that. You're saying even if you know the person has dissipated all the funds, you can sue for the equitable lien, even if you know the funds are all gone? Correct, Your Honor, as long as that was a knowing dissipation, that that's what happened. And that's what the Substitutionary Monetary Treaty is. Do you have any cases? Sure. Otis itself is a case that does that, Justice Holmes's opinion. Justice Story has a description of other cases in his treatise. Our brief talks about the Baxter case and the Bank of Marion case. These are the closest analog to this case, because they're not the general rule about can you recover from general assets. They're about the specific rule, can you profit from your wrongdoing when an equitable lien by attachment is or an equitable lien by agreement is already attached. It has to be pretty easy for you to protect yourself, doesn't it, as soon as at some time after the injury you do write a letter to the person and say, look, you need to know that if you sue somebody, the money is ours, and because we have these rights of subrogation, or let us know if you're going to, and we'll show up in court with you and help you? Or, see, I guess it would probably be pretty easy to monitor it yourself. I mean, the court's computerized dockets, you just punch in Montanil and say whenever that pops up on the docket, and you find out right away, certainly long before the case is resolved, it doesn't, I mean, I think your friend has a significant point that it's actually not as hard as it might appear. So three things, Your Honor. First, we're not grounding our argument in the policy things. We do think that the policy consequences are important, but we think that if the test is what's traditionally available in equity, these three specific lines of authority that we're pointing to answer that question. But as to the policy concerns, we think exactly as you said to my friend on the other side, there are two big problems with that. Number one is plans don't get notice about when settlements occur. In the amicus brief from NASP explains most auto accidents, for example, are settled without any public record, without any lawsuit being filed whatsoever, so you can't exactly type it into Westlaw or something like that. So that's one problem. The other is that it becomes very expensive for plans to monitor this stuff. And plans aren't, you know, some for-profit entity. Every dollar that you spend that the plan has to spend on monitoring or on writing these letters or filing lawsuits or TROs is a dollar that is taken away from innocent plan beneficiaries, people who've done nothing at all. Right. I mean, that's a point we've made in our precedents, but it can't, you can't carry that so far that otherwise you'd say, well, the plan always wins. Right. I'm certainly not trying to do that. All I'm saying is that the policy arguments here I do think are substantial and have weight. The amicus briefs before you say over a billion dollars each year is recovered through these reimbursement actions. And if you adapt their plan, then as you were saying to my friend, you're going to just tell client, you're incentivizing, telling the Montaniels of the world, spend that money right away. Settle the case at 10 o'clock, and by 1001, spend all the money, and in that circumstance, then plans are out of luck, innocent beneficiaries, that means, are out of luck, and people like Mr. Montaniel get a double recovery. And equity is not so brittle. There is no tradition in equity that supports this idea. As Justice Alito, you were saying, how could this make any sense? It didn't make sense at equity. Equity has always been more flexible than that. It's always recognized the idea that people shouldn't be able to profit from their wrongdoing, and that rights have remedies, and avoiding formalistic distinctions. And speaking of formalistic distinctions, the Solicitor General's rule is as formalistic as it gets, because they say you can get the remedy out of general assets, as long as the lawsuit is filed in time for — the lawsuit is filed at a time when there was possession of the fund. That is— Scalia, equity itself is a formalistic distinction. I mean, to argue that we shouldn't make formalistic distinctions in trying to figure out whether a particular relief is equitable relief or not, I don't — that's incomprehensible to me. Well, Justice Scalia, as Justice Frankfurter said, equity, quote, "... eschews mechanical rules and depends on flexibility. Every equity treatise — look at Pomeroy, for example, at Section 111 — all the other treatises say — Pomeroy doesn't support you. Very much — Most of Pomeroy's quotes are contrary. Very much it does. There is not a quote from Pomeroy or from any of the other treatises that deal with this situation, when someone is trying to profit from their second wrong, when there's already an equitable lien by attaches. And, you know, for example, Pomeroy, just on the flexibility interchange, were saying, Section 111, "... equity has followed the true principle of contriving its remedies so that they shall correspond both to the primary right of the injured party and to the wrong by which that right has been violated. It has therefore never placed any limits on the remedies it can grant, either with respect to their substance, their form, or their extent, but has always preserved the elements of flexibility and expansiveness so that they can be modified to meet the requirements of every case." And this is a perfect example — Well, I don't know that you can read our precedents in this area to say that they're very flexible. I mean, Sereboff, the difference between an equitable lien for restitution and equitable lien by agreement, you know, you can get, you know, deficiency judgments opposed to legal judgments, and whether one's sort of an adjunct to the equitable action or freestanding. It's an area where the equity rule, strikingly, is very technical.  It's a very technical claim in the first instance. And so Knudsen, for example, says no because there's no possession of the fund. Sereboff says here there is possession, therefore there is. We don't quibble with any of that. Here as this case comes to the Court, everyone agrees — that's the third point I made at the outset — everyone agrees there was an equitable lien by agreement. The only thing we're disagreeing about is whether or not by spending all the funds we've lost our remedy. And with respect to that question, they have general precedents which say you can't go after general assets. We agree with that. The relevant question is when someone has raw — when a valid equitable lien by agreement attaches and then someone acts to dissipate that, can they profit from their wrong judgment? Sotomayor, I don't know if I'm reading it rightly or not. I'll certainly be corrected by the author and dissenters if I'm not. But it seemed to me that they're basically saying whatever remedy you have has to be an equitable remedy. The most that I read about a substitution decree or a deficiency decree is that it's an ancillary jurisdiction to issue those. Is that consistent with saying it's equitable? Isn't it just a legal claim that equity sometimes permitted an equitable court to exercise? But wouldn't it still be legal? And not within the scope of ERISA? Justice Sotomayor, this is, again, part of the urban legend that's being developed around this. There is no case that says that a substitutionary monetary decree is a legal judgment or is ancillary. To the contrary, cases that we're citing such as Baxter and Otis suggest that it is an equity not in that. And, indeed, if there's any doubt about this, I suggest that you'd have to say it's ancillary, which is pendant jurisdiction, was if an equity court was going to decide a legal claim, they had to label it as a legal claim because of Seventh Amendment reasons, because otherwise it might, you know, there's all sorts of jury trial issues that come up. So that's why the tradition for cleanup jurisdiction was to label those claims specifically to say, okay, first we're going to solve our equitable claim, and now we're going to turn as part of our pendant jurisdiction or ancillary. Sotomayor, I'm still a little bit confused by all of this. In my mind, you get money when somebody gives it to you. And I know that a lawyer is an agent, but the agent is keeping a piece of the money. You can still go after the client for the piece the lawyer took? So with respect to the lawyer piece, it's much more complicated, and this goes to Justice Breyer's question. I mean, there's actually a circuit split on this question about can you go after the lawyer. And the reason why you may not be able to go after the lawyer is the lawyer is not a party to the underlying agreement. And that's what I think the Eighth Circuit says in contradistinction to others. And so that's not a great remedy. And of course, it requires the lawyer to be on notice of the plan and all the reimbursement obligations and the like. Under equity, Justice Sotomayor, I think the idea is that when someone has made a valid promise for these funds, such as here, Montanil knew that he was playing with house money. He knew that this wasn't his money, it was the plan's money from the start, and then he goes and spends that money on other things. Yes, you can go after his general assets to recover that spending on other things. And that is something amply supported by these three different traditions in the case law. Those are the closest analogs to what's going on here when someone has dissipated and frustrated an action that otherwise existed. Ginsburg-McCarthy When you say, again, when does the lien attach, is it when the tortfeasor pays, gives the check to the lawyer, or is it when the beneficiary actually gets the $200,000? Katyal Well, I don't think that the answers are clear on that, but I do think it's when he takes ti- I think that most of what this Court has said is that it's when he takes title to the thing, and presumably he takes title to the thing at the moment that the check is given to the lawyers. Now, if at that moment, Justice Ginsburg, say the bank account of the lawyer was hacked and the $500,000 settlement was gone, our view is his general rule then kicks in. In that circumstance, we cannot recover. The only thing we're saying is that when a defendant knowingly dissipates a fund as to which someone else has a claim, it's in that circumstance that the exception, as Justice Story called it, that peculiar exception applies, to try and basically make sure that he isn't profiting a second time from his wrongdoing. That's why the claim is a very limited one at equity. It's just a — it's a — and again, it's only limited to the amount of the lien. You can't go more than that. You can't have punitive damages and the like. And it's encumbered by all the defenses in equity. We have to take the bitter with the sweet. So latches and, you know, and unconscionability, all of that would be standard defenses that are available to such an action. Now, my friend on the other side has said, well, this is going to reach disability situations. Absolutely not. I mean, I think you have a variety of amicus briefs before you that say that there's a specific statute, 407A, which prohibits liens against Social Security disability overpayments. He says it's going to reach pension overpayments. Again, that's not our rule. Our rule in those circumstances, a pension plan is overpaying a beneficiary. And if the beneficiary spends that, well, that's not something that they're knowingly dissipating. That's very different than a circumstance like this, in which someone is dissipating a fund as to which they — someone else — as to which the plan has an underlying lien against. And that's why it's a very limited rule. It's one that tracks the tradition at common law. Both Otis talks about misappropriation, and Baxter talks about wrongful dissipation when someone has a valid lien against you, and as well, the Orr case for the swollen assets theory and the like. Now, my friend on the other side says in his brief, well, then why in the world are we spending so much time — are all these equity cases spending so much time on tracing? And our view is very simple on that. Tracing makes a lot of sense. In the Lyon-Sheriff cases, tracing becomes very important because you don't have a defendant who is acting wrongfully and knowingly dissipating a fund. And so the plan or whoever the trustee is wants to — wants to go after general assets, but then can't unless they can trace them to a specific asset. Tracing is just a lien priority doctrine. It's nothing more than that. The restatement that my friend cites on the other side, that is cited in Knudsen at Section 215, is as clear as day. It just talks about lien priority. It doesn't say that there is no claim if general — if someone dissipates a fund. It says that they are not entitled to lien priority. That is it. And, look, we agree with that. We're not here trying to say we have a priority over other — asset over other creditors. We're just simply saying we are, to use the language of the restatement, a general creditor. Roberts. So you don't have priority over other creditors. So if Mr. Montanillo owes somebody money, he — it's all right if he takes money from the fund and pays that debt? Well, we are then — you know, as long as we can't trace it in a world of no tracing. So there's obviously some funds here that we may be able to trace because, as the interchange with Justice Ginsburg was suggesting, it's not totally clear what was spent and what isn't. But with respect to the rest, yeah, I mean, we have to take the bidder with the sweet, and that means we are a general creditor out of general assets. It's not like we get first priority over those assets, which is why this remedy is at best a second best one for us. I mean, the ideal is, of course, to prevent someone from dissipating the funds altogether. And we do think if this Court recognized, as I think most of the circuits have, that we have a cause of action here, then I think it would deter people from engaging in the kind of behavior that Mr. Montanillo did. I just want to be clear. I understand your position and your answer. The fund has a claim for reimbursement from the accident proceeds. Accident proceeds put into the bank account of the land beneficiary, the injured — the person who was injured in the accident. He also has another creditor. You stand evenly with that creditor? So if — Was that your answer? Well, it is in the situation of a dissipated fund. So obviously, if we can trace — and this is why tracing is still important. Well, it's your example. The case is settled at 10 in the morning. At 10.30 in the morning, it's in the bank account. Yes. Nothing's been spent, but there's a creditor, and the creditor's claim is equal to the plan's claim. And there's only enough money for one. What happens? Well, Justice Kennedy, I might — I thought you would have priority. I would, if — it sounds like we can trace that fund. That is, the fund hasn't been spent in that circumstance. It's traceable. It's in the bank account. Right. So then — and that's exactly right. So we would have priority over that $500,000 in that circumstance over other creditors. My only point is, if we're in the Montanile-like situation, in which he has — let's just say he spent down that entire fund, and there's another creditor who also Montanile owes money to. Once that happens, we are — we can only recover just like the other general creditor. And that's what the restatement says. That's all it says. It does not say that if a fund is dissipated, that there is no claim anymore. That would be contrary to the whole idea, as Justice Alito's question was, about what equity is all about. That makes no sense. And equity is not that brittle. Justice Scalia, I understand that there are traditions in equity, and there are certain rules, but at the end of the day, it was never that formalistic, and have the idea that someone could profit so much from their wrongdoing and frustrating and equitable claim that otherwise exists. Kagan. But it seems, Mr. Katyal, that you're relying on remedies that really developed very late in equity's life. In other words, you know, equity was going along, and there were these very formal rules distinguishing it from the legal world. And then as it progressed, there were people who thought, we need some cleanup authority, or maybe even people just thought, these rules aren't working in the way that we want them to work. So equity got a little bit less equitable as it approached the merger with law. But that, I think, is not really what we've meant when we've said, we're looking to things that are typically equitable. You know, not like the last throws of equity as it was becoming a legal system. So Justice Kagan, I'd spot you that with respect to swollen assets, you know, which does come around in the 1930s, and so maybe there's an argument there. But, for example, substitutionary monetary decrees, Justice Holmes' opinion is in 1897, exactly the same year as Barnes, the Chief Justice's opinion, that was the foundation for Sereboff. And indeed, it has a tradition that goes back to Justice Story's 1828 treatise, which cites earlier cases even still. So I don't think that we're relying on that. Kagan. Well, you take the deficiency judgments, which I take it was a rule was needed to give equity that authority, because everybody thought equity didn't have that authority. Well, even if you can make that argument about deficiency judgments, which I'll respond to in a moment, you can't make it about substitutionary monetary decrees, which is a distinct body in equity. And with respect to that, in 1864, absolutely, this Court promulgated Equity Rule 92, which allowed for deficiency judgments. But I think the fact that they had to issue a rule doesn't somehow make it a law claim, as my friend says. I mean, after all, Rule 73 promulgated in 1864 was a rule about preliminary injunctions. And I certainly think preliminary injunctions were available in equity, and, you know, the fact that there was a rule about it didn't somehow convert it into a law claim. So I think the very fact that this Court issued a rule called Equity Rule 10 is suggestive of the fact that this is a tradition in equity. Now, look, if there's some doubt about this, if there's some doubt in the traditions, and they've got — I don't think they have a single case, but even if you thought they did, that said that we were prohibited — that we were prohibited from making these claims at equity, I think you should err on the side of recognizing the claim. Why? For three reasons. One, because, as the Solicitor General's brief in Sereboff said, the point of ERISA is to try and give effect to written plans and their determinations. And if there's doubt as to what the equity tradition is, you should read it in light of trying to enforce plan terms. That is the pages 23 and 24 of their brief. It is consistent with the way this Court approaches, for example, Title VII cases and the like. The second is that, again, all we're seeking here is a remedy. We're not trying to get more than what would have been otherwise available at equity. Our view is that when someone frustrates an otherwise equitable claim, we can only try and reinstate that claim. You can't get more from it because of their second wrongdoing. So I think we're giving effect to what equity is all about. And then third, and this goes back to your last question to Ms. Anders, you said, you know, what does typically available at equity mean? And you know, that test comes from Mertens. Mertens isolates three examples of what was traditionally available at equity, mandamus, injunction and restitution. Now, if you look at mandamus, for example, there are precedents from this Court that suggest that equity didn't recognize mandamus. You know, this Court twice in the 19th century, in Hine and Downs, both said that twice. And I think that's a good textual clue that when there's doubt as to whether something is actually traditionally available at equity or not, you should err on the side of recognizing it as traditionally available, as this Court did in the foundational Mertens test. We're not quibbling with Mertens. We're simply saying we're at least as strong as to whether something was traditionally available at equity as mandamus, because in mandamus, two cases from this Court suggested it wasn't traditionally available, and yet the Court still in Mertens used that as one of its three examples. If there are no further questions. Thank you, counsel. Mr. Stris, you have four minutes remaining. Thank you, Mr. Chief Justice. I'd just like to make two brief points. The first one is that the historical authorities are unquestionably on our side. And it was interesting hearing my friend, Mr. Katyal, go straight to the substitutionary monetary remedy. I want to say a couple of things about this. First, if you look carefully, the exact argument he's making was rejected by the holding of this Court in Great West. This is Section 2C of the Court's opinion. It's kind of a lesser-known part of the opinion. The argument was made that a beneficiary of a trust commits that second wrong that he was talking about when they get a loan contractually and refuse to pay it back. And what this Court said is, no, that's not typically available in equity, and, you know, it's precisely the distinction that he's trying to now push upon you to squeeze this remedy through. So let's look at the substitutionary monetary decree cases he talks about. Not a single one of them involves an equitable lien by agreement. They don't involve an agreement. They're restitutionary cases. So that's also interesting to me that he criticizes our side talking about the restatement of restitution, Section 215, whereas we talk about Pomeroy, we talk about Jones on liens, we talk about the Person case. It's an 1880 case on page 35 of the blue brief. It's an equitable lien by agreement case. The historical authority here is beyond dispute. And I guess the last thing I'll say on this is, look at the Schaeffer's appeal case. It's one of his lead cases on page 37, note 6. It says that substitutionary monetary relief is legal. So I think if you look at the cases, not that I would wish that upon anyone, they really do not even credibly support the proposition historically. So where does that leave us? I mean, I think I was honest from minute one when I got up here. The only reason that you would contort the standard that you've developed, let's be honest. You know, spot me this. You have to believe our position is fundamentally inconsistent with the purpose of ERISA. If you do, then I have a problem. But here's where we're at. Mr. Chief Justice, you made a very strong policy argument about why my rule is no good. With respect, I think I could make a very strong policy argument about why participants who prove a clear bad-faith breach by a plan should get consequential damages. I could make that argument. I think I could make it very persuasively. But that's not what we're here to do. We're here to apply the historical test. So let's end essentially with, I think, a key concession that Mr. Cotthiel makes about the disability context. So if you look at this case and you say, well, this subrogation, I don't know, these arguments that the plans have ways to protect themselves, maybe they're right, but maybe they're onerous. And, you know, I'm just not sure if it's going to add to the cost of plans. Go look at the disability cases, because I was stunned when Mr. Cotthiel got up here and said, oh, well, the disability cases are different. Like, this doesn't extend to them. He filed a cert petition, with respect, with this Court in the Bilieu case, which was one of the circuit split cases that's here. Half of the circuit split cases involve the disability context. So I'll end with this. What does that tell you? The fact that you look at these disability cases and you see that money is being advanced and it's being spent before the lien even attaches, and yet they're made part of the circuit split. And in this case, Respondent is not willing to defend that as a policy position. And I think what it tells you is that fair-minded people could disagree as to where you want to place the risk. And so when we go and look at this and we think about it in terms of burdens, if there's any reasonable position, as you look at this, that a rule that says you can essentially go after general assets means that some meaningful number of fiduciaries will abuse that to assert rights they don't have or to delay, then I think it's a reasonable  And I think you need to go with the clear line of historical authorities. Thank you. Roberts. I'm sorry, counsel, you say he filed the cert petition. Is that on behalf of the same client as here? It's not on behalf of the same client, no, but it's the ‑‑ it shows that the disability cases are governed by precisely the same legal rule. For him to suggest that the legal rule that you're going to decide here would not also apply in disability cases flies in the face of the precise position he took when he filed the cert petition in Billiard. Well, I'm just trying to track down, are you saying that because he represented a different client and took a position in that case, he's somehow bound by that here? Oh, no, no, certainly not. What I'm saying is we have a circuit split and half of the cases are subrogation and half of them are disability. So the courts recognize that the legal principle in this case will not only apply in subrogation cases, but they'll apply in disability cases. And Mr. Cottiel recognizes that because he represented a party in one of those cases. So my point only is don't accept the representation that the rule here can somehow be confined to subrogation cases, because as an empirical matter, it cannot. Well, I would be surprised by the proposition that lawyers are somehow collaterally stopped if they take a particular position on behalf of one client from taking a different position in a different case. No, most certainly that's true, and perhaps I've miscommunicated. We have a circuit split which led to the court granting this case. And all of the cases purport to resolve the same question presented. Half of them are in the subrogation context, half of them are in the disability context. So I don't see how one could credibly take the position that you can decide this case and it would not affect the mine run of disability cases, because they're part of precisely the same circuit split. It's the same issue. Thank you, counsel. The case is submitted.